UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TOMMY L. GEORGALIS, individually and d/b/a IT'S ALL GREEK TO ME | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:23-CV-1682-B |
| STATE FAIR OF TEXAS, | § § | |
| Defendant. | § § | |

MEMORANDUM OPINION AND ORDER

Before the Court is Defendant State Fair of Texas (the "State Fair")'s Motion to Dismiss Plaintiff Tommy L. Georgalis, individually and d/b/a It's All Greek to Me ("Georgalis")'s Second Amended Complaint (Doc. 15). For the following reasons, the Court **GRANTS** the State Fair's Motion and **DISMISSES** the Second Amended Complaint **WITH PREJUDICE**. A final judgment will follow.

I.

BACKGROUND

Georgalis operated a food booth at the Texas State Fair ("Fair") from 1989 to 2022. Doc. 15, Second Am. Compl., ¶¶ 6, 21. In 2023, Georgalis was not invited back to the Fair. *Id.* ¶ 44. This case is about the State Fair's refusal to contract with Georgalis to operate his booth at the 2023 Fair.

Georgalis is of Greek ancestry. *Id.* ¶ 5. He owned and operated a food booth, It's All Greek To Me, which was both the only Greek-themed and Greek-ancestor-owned booth in the Tower Building Food Court at the Fair. *Id.* ¶¶ 3, 17.

Concessionaires like Georgalis enter into yearly contracts with the State Fair to operate their booths. *Id.* ¶ 10. The process begins in the spring of each year when concessionaires submit applications to the State Fair; the State Fair then contracts with the concessionaires it selects from the pool of applicants. *Id.* ¶¶ 8–10. According to the State Fair's website, "[p]rior-year concessionaires, in good standing, are usually given a right of first refusal." *Id.* ¶ 8. After the Fair is complete, the contract between the State Fair and each concessionaire ends, and the cycle begins again. *Id.* ¶ 10. Georgalis successfully sought and obtained a contract to operate his booth every year from 1989 to 2022. *See id.* ¶¶ 6, 44.

Georgalis claims that State Fair officials have a history of treating him differently than other concessionaires. *Id.* ¶ 21. For example, in 2015, Georgalis and seven other concessionaires were cited by the Texas Alcohol and Beverage Commission ("TABC"). *Id.* ¶ 25. Georgalis alleges that the State Fair forced only Georgalis to stop selling alcohol for the weekend, even though the TABC had also cited other concessionaires. *Id.*

According to Georgalis, the State Fair continued to treat Georgalis poorly after this incident. For example, Georgalis made several requests to open a second booth; however, "[d]espite repeated requests for a second booth, and promises by Fair officials," the State Fair denied each request. *Id.* ¶ 26. The State Fair instead gave available booths to other concessionaires of non-Greek ancestry. *Id.* ¶ 68.

Georgalis also alleges that the State Fair prohibited him from selling certain food items. *Id.* ¶ 28. According to Georgalis, a State Fair official, Melanie Linnear, denied Georgalis's applications to add new menu items on 18 separate occasions. *Id.* On a few occasions, Georgalis was able to override Linnear's denials by appealing to the Vice President, who "was baffled by and expressed

concern that Linnear issued [such] denials." *Id.* Linnear "singled out and refused . . . Georgalis the option of carrying . . . corn dogs . . . even though she allowed other concessionaires, who were not of Greek ancestry . . . , to do so." *Id.* ¶ 29. The State Fair also denied his requests to add Greek hamburgers, Greek hot dogs, Greek chili, Greek pizza, and Greek fries to his menu. *Id.* ¶ 28. Georgalis also put in repeated requests to open a second booth to sell souvlaki. *Id.* ¶¶ 26–27. The State Fair denied his requests and ultimately gave concessionaires who were not of Greek ancestry the right to have souvlaki booths. *Id.* ¶ 68.

Vernita Hubbard, a former employee of the State Fair who reported directly to Linnear between 2018 and 2021, stated that Linnear told her that she "had no intention to grant [Georgalis] additional food menu items or to give him a second booth." Doc. 15-6, Ex-F, 1. Hubbard also recalled Linnear telling her that Georgalis "gets on my nerves, I don't know why he keeps asking, I am not going to give him anything." *Id.* Hubbard found Linnear's refusal to be "out of the ordinary and inconsistent with the treatment she provided other fair concessionaires" and that Linnear "treated Mr. Georgalis less kindly than she did other concessionaires." *Id.* Another vendor at the State Fair noted that Linnear treated Georgalis differently from how "other concessionaires were treated when they submitted food menu changes." Doc. 15-1, Ex-A, 2. The vendor stated that Linnear treated Georgalis "rudely, often ignoring him when he had questions and brushing him off with a wave of her hand." *Id.*

Georgalis alleges that Linnear gave preferential treatment to certain minorities. He alleges that Linnear said she "strive[s] to invite more minority food and beverage vendors to participate in the Fair." Doc. 15, Second Am., Compl., ¶ 34. Georgalis argues that her statements "clearly indicate that she considers race when making decisions." *Id.* Georgalis also attached a Declaration from a

food vendor, who is white, to his Second Amended Complaint. The white food vendor stated that he asked Linnear for a second booth and Linnear "shook her head, and responded, 'No, you are not the right color, you will never get another booth.'" Doc. 15-1, Ex-A, 2.

On February 22, 2023, the State Fair emailed Georgalis an application to renew his booth for the upcoming Fair. *Id.* ¶ 31. Georgalis completed and submitted the application the same day. *Id.* ¶ 33.

On February 28, 2023, "the Fair Advisory Committee (of which Linnear was the senior member) met to discuss the 2023 Fair." *Id.* ¶ 35. The meeting minute notes from that date indicate, "[t]ime to let [Georgalis] move on from the fair. Product not executed properly as far as the tie-into the name and branding. Vendor has had multiple [] staff complaints about his negative disposition when working with other vendors and [] staff." *Id.*; *see* Doc. 15-8, Ex-H, 3. Georgalis alleges that Linnear drafted these statements "knowing they were false in order to gain [the Committee's] approval . . . to expel Georgalis form the Fair." *Id.* ¶ 35. Through discovery, the Fair admitted it did not possess any written complaints from patrons, other vendors, or Fair employees regarding Georgalis. *Id.*; Doc. 15-8, Ex-H, 3.

On March 2, 2023, Georgalis participated in a "Talk Back" meeting with Linnear and her assistant. *Id.* ¶ 36. "Talk Back meetings . . . were conducted to recap the year's sales rankings, other metrics, to allow the parties to raise in an open and non-retaliatory manner any requests or concerns, and to make preparations for the next State Fair." *Id.* ¶ 37. "During the Talk Back meeting, Linnear noted . . . [Georgalis's] positive increase in sales from 2021 to 2022." *Id.* ¶ 40. In 2022, Georgalis's sales ranked "25 out of 51 vendors operating a single concession booth. . . . [and] 15 out of 28 booths . . . within the Tower Building Food Court." *Id.* ¶ 19. At the Talk Back meeting, Georgalis "reiterated

his frustration that [he] had yet to receive a second booth from the Fair." *Id.* ¶ 40. In response, Linnear instructed her assistant to "make a note of this and make sure [Georgalis] receives an application for an additional location at this year's Fair." *Id.* Georgalis contends that "[d]uring the 'Talk Back' meeting, the [State] Fair represented to [him] that [he] would return . . . [in] 2023" and "be provided with an additional application for a 'new' booth." *Id.* ¶¶ 51, 58.

In April 2023, Georgalis was informed that he would not be offered a contract for the 2023 Fair. *Id.* ¶ 44. According to Georgalis, "[o]ther concessionaires that were not of Greek ancestry" had lower sales rankings than he did in 2022 yet were offered a contract to return in 2023. *Id.* ¶ 19. Although "Georgalis repeatedly requested an explanation from the [State] Fair as to why [his] booth was taken away," no explanation has been given. *Id.* ¶ 45

After he learned that his contract was not being renewed, Georgalis asked the State Fair for permission to sell his booth. *Id.* While the State Fair had, in the past, approved the sale or transfer of booths that were operated by "concessionaires of non-Greek ancestry," it denied Georgalis's request to sell his booth without explanation. *Id.* He alleges that another concessionaire was able to sell her booth outside "any known Fair contract term." *Id.* ¶ 13.

Georgalis sued the State Fair for refusing to renew his contract. *See* Doc. 1, Ex. B., Pet. Georgalis brought claims for race discrimination under 42 U.S.C. § 1981, fraud, and promissory estoppel. Doc. 15, Second Am. Compl., ¶¶ 49–73. Specifically, he alleged that: (1) the State Fair refused to offer Georgalis a contract for the Fair because of his Greek ancestry, in violation of § 1981; (2) the State Fair fraudulently represented that Georgalis would return for the 2023 Fair; and (3) Georgalis detrimentally relied on the State Fair's promise that he would return to the 2023 Fair with a second booth. *Id.* The Court granted the State Fair's first Motion to Dismiss and dismissed

Georgalis's Amended Complaint without prejudice. Doc. 13, Order, 1. The State Fair has moved to dismiss Georgalis's Second Amended Complaint, arguing that it lacks sufficient factual allegations in support of each cause of action. Doc. 16, Mot., 1. The Court considers it below.

## II.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6) authorizes dismissal of a plaintiff's complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). In considering a Rule 12(b)(6) motion to dismiss, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (citation and internal quotations omitted). But the "court will not look beyond the face of the pleadings to determine whether relief should be granted based on the alleged facts." *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). When well-pleaded facts fail to meet this standard, "the complaint has

alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal quotations and alterations omitted).

## III.

## ANALYSIS

The Court concludes that the Second Amended Complaint fails to state a claim for relief. Georgalis did not plead sufficient facts to support a claim for race discrimination under § 1981, fraud, or promissory estoppel. As a result, the Court dismisses the Second Amended Complaint with prejudice because he has already had the opportunity to cure the deficiencies in his Complaint and has failed to do so.

A.    *Georgalis Has Failed to State a Claim Under § 1981.*

Georgalis asserts a claim for race discrimination against the State Fair under 42 U.S.C. § 1981. Doc. 15, Second Am. Compl., ¶¶ 63–73. He alleges that the State Fair refused to renew his contract because of his Greek ancestry. *Id.* However, the allegations in the Second Amended Complaint do not plausibly establish that, but-for Georgalis's race, the State Fair would have offered him a contract. The Court, therefore, concludes that Georgalis has failed to state a claim against the State Fair under 42 U.S.C. § 1981.

Section 1981 codifies the language of the Civil Rights Act of 1866, which was passed "in the aftermath of the Civil War to vindicate the rights of former slaves." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 333 (2020). Towards that end, § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a).

While the text of § 1981 does not explicitly provide a private right of action, the Supreme Court has long held that such a remedy is implicit in the statute's purpose. *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459 (1975); *see also Williams v. Waste Mgmt., Inc.*, 818 F. App'x 315, 325 (5th Cir. 2020). To state a claim for race discrimination under § 1981, "a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerns one or more of the activities enumerated in the statute." *Green v. State Bar of Tex.*, 27 F.3d 1083, 1086 (5th Cir. 1994).

Although the State Fair argues that Georgalis failed to allege sufficient facts in support of each element of his § 1981 claim, *see* Doc. 16, Mot., 4–15, the dispositive issue here is the second element—discriminatory intent.[1]

To properly plead discriminatory intent, a plaintiff must allege "facts that, taken as true, permit the Court to infer 'that race was a but-for cause of his injury.'" *Simmons v. Triton Elevator, LLC*, No. 3:19-CV-1206-B, 2020 WL 7770245, at *3 (N.D. Tex. Dec. 30, 2020) (Boyle, J.) (alteration omitted) (quoting *Comcast Corp.*, 589 U.S. at 333). The test for but-for causation is "whether the outcome would be different but for the protected class," i.e., race. *Abdallah v. Mesa Air Grp., Inc.*, 83 F.4th 1006, 1015 (5th Cir. 2023). "In other words, a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." *Id.* at 1014 (quoting *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020)).

---

[1] The Court does not decide the sufficiency of the pleadings as to the first and third elements of Georgalis's § 1981 claim.

But-for causation "may be—and commonly is—demonstrated by circumstantial evidence." *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 386 (5th Cir. 2017). As relevant here, such circumstantial evidence may include "[a]n allegation that similarly situated non-minorities received better treatment" with respect to rights enumerated in § 1981—here, the right to contract. *Id.* (citing *Crosby v. Kilgore*, 9 F.3d 104, 1993 WL 481800, at *1 (5th Cir. 1993) (unpublished)). Ultimately, however, the inquiry is whether the defendant refused to transact "because of" plaintiff's race, *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 767 (5th Cir. 2019), and thus it is not necessary, at the pleading stage, to show similarly situated non-minorities were treated more favorably if there are other "'facts, direct or circumstantial, that would suggest [defendant's] actions were based on . . . race.'" *Sanchez v. Chevron N. Am. Expl. & Prod. Co.*, No. 20-30783, 2021 WL 5513509, at *5 (5th Cir. Nov. 24, 2021) (alterations omitted) (quoting *Raj v. La. State Univ.*, 714 F.3d 322, 331 (5th Cir. 2013)).

Here, Georgalis's pleadings do not allow a plausible inference that race was the but-for cause of his injury.

1.    Georgalis Failed to Plead That He Was Similarly Situated to Other Concessionaires.

To begin, Georgalis did not specifically plead that he was similarly situated to the non-Greek concessionaires that were offered contracts in 2023. *See Body by Cook*, 869 F.3d at 387. The only meaningful comparison Georgalis draws between himself and the non-Greek concessionaires who received contract renewals is with respect to sales rankings and their location at the Fair. *See* Doc. 15, Second Am. Compl., ¶¶ 16, 19. He claims that "[o]ther concessionaires that were not of Greek ancestry . . . were ranked lower and, yet, received renewed licenses for the 2023 season." *Id.* ¶ 19. However, Georgalis has not alleged any facts suggesting other concessionaires achieved lower sales

figures than Georgalis under similar circumstances. *See Coleman v. Kijakazi*, No. 21-10399, 2023 WL 2660167, at *2 (5th Cir. Mar. 28, 2023) ("For a comparator to be similarly situated, however, they must be under nearly identical circumstances.") (internal quotations omitted); *Zinnah v. Lubbock State Supported Living Ctr.*, No. 5:22-CV-035-H, 2023 WL 2468746, at *2 (N.D. Tex. Feb. 15, 2023) (Hendrix, J.), *aff'd*, No. 23-10242, 2023 WL 7314350 (5th Cir. Nov. 6, 2023). While Georgalis has alleged the locations of their booths on Fair grounds and the sizes of their booths, he still has not alleged the number of years they operated at the Fair, the food they sold, or their prior rankings. *Cf. Pullins v. Hancock Whitney Bank*, 512 F. Supp. 3d 647, 659–60 (M.D. La. 2021). In the absence of any such allegations, the Court cannot infer discrimination from the sole fact that "[o]ther concessionaires that were not of Greek ancestry . . . were ranked lower and, yet, received renewed licenses for the 2023 season." Doc. 15, Second Am. Compl., ¶ 19; *see Zinnah*, 2023 WL 2468746, at *2.

Nor has Georgalis shown how he compared to these other concessionaires with respect to any other potentially relevant category besides sales. In failing to do so, Georgalis essentially assumes that the State Fair considered no other factors in deciding whether to renew a concessionaire's contract. *Cf. Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 471 (5th Cir. 2016). But such an assumption is not warranted here. The Second Amended Complaint indicates that, when selecting new applicants, the State Fair considers the "uniqueness of product, appearance of display, and references from other fairs or events." Doc. 15, Second Am. Compl., ¶ 8. Georgalis, obviously, was not a new applicant; however, this allegation suggests that the State Fair takes a more holistic approach in selecting concessionaires generally, rather than looking solely to sales figures. *See id.* ¶¶ 6, 8. Under these circumstances, the Court cannot say that the Second Amended Complaint

supports an inference that Georgalis was similarly situated to the non-Greek concessionaires who were offered a contract. *See Chhim*, 836 F.3d at 471; *Body by Cook*, 869 F.3d at 387.

While Georgalis likens his pleadings to those in *Hoyt v. American National Insurance Company*, No. 3:20-CV-545-L, 2021 WL 2823449, at \*5 (N.D. Tex. July 6, 2021) (Lindsay, J.), that case is distinguishable. *See* Doc. 17, Reply., 10–12. In *Hoyt*, an African American plaintiff, who was employed as a district manager, brought a § 1981 action against his employer after he was forced to accept a demotion for investing outside of work. 2021 WL 2823449, at \*1–2. In his complaint, the plaintiff alleged that while he and Caucasian district managers "engaged in the same investment activities outside of work, . . . Defendant only punished [plaintiff] for engaging in such activities that were allegedly prohibited by his employment contract by requiring him to sign an agreement that would result in a demotion and decrease in pay." *Id.* at \*5. The district court concluded that these allegations were sufficient to support a plausible inference "that race was the but-for cause of Plaintiff's injuries because, with respect to district managers pursuing unrelated financial endeavors outside of work, Defendant treats black and white . . . district managers differently in its making and enforcement of employment contracts." *Id.*

Unlike *Hoyt*, Georgalis does not allege that *similarly situated* non-Greek concessionaires were treated more favorably. Whereas the plaintiff in *Hoyt* pleaded that he was the only one punished for engaging in specific conduct even though his white co-workers, who had the same job and engaged in the exact same conduct, were not punished, the only similarity between Georgalis and the other booth operators the Court can glean from the Second Amended Complaint is that they were concessionaires. *See Hoyt*, 2021 WL 2823449, at \*5. As explained above, while Georgalis generally pleaded that he had better sales figures than some non-Greek concessionaires and they had similarly

sized booths, he has not alleged any other fact which supports the inference that he was similarly situated to those who received a new contract. Thus, *Hoyt* is inapposite here.

     2.    Georgalis Did Not Plead Facts That Allege Discriminatory Intent.

And although it is not necessary to allege that similarly situated non-minorities were treated more favorably to survive a 12(b)(6) motion, there are no other allegations in the Second Amended Complaint which would suggest the State Fair acted with discriminatory intent in refusing to contract with Georgalis. *See Sanchez*, 2021 WL 5513509, at *5. Georgalis alleges five instances of differential treatment, none of which render plausible the conclusion that the State Fair acted discriminatorily in refusing to renew Georgalis's contract.

First, Georgalis pleaded that he was forced to close his booth for the weekend in 2015 after he received a citation from the TABC, even though seven other concessionaires—who were not of Greek ancestry—received the same citation and were allowed to continue operating. Doc. 15, Second Am. Compl., ¶ 25. The fact that Georgalis was forced to shut down for one weekend in 2015 does not show that the State Fair acted discriminatorily in 2023 by not renewing his contract. *Cf. Jenkins v. City of Dallas*, No. 3:22-CV-0960-B, 2023 WL 3514455, at *7 (N.D. Tex. May 17, 2023) (Boyle, J.) (finding seven years between discriminatory comments and an adverse employment action too long to create an inference of discrimination).

Second, Georgalis alleged that the State Fair prohibited him from selling certain food items, although "other concessionaires, who were not of Greek ancestry" were allowed to do so. *Id.* ¶¶ 28–29. However, the State Fair later reversed some of these decisions, making any claim of discrimination less plausible. *Id.* Furthermore, Georgalis was prohibited from selling Greek burgers, Greek hot dogs, Greek chili, Greek pizza, Greek fries, and Greek corn-dogs. *Id.* To the extent

Georgalis claims that the State Fair acted with anti-Greek animus in prohibiting him from selling traditional American dishes with the word "Greek" in front of them, the Court is not persuaded. The Court cannot say it is discriminatory for the State Fair to limit Georgalis's menu to Greek food items, and not let him sell American food items with a "Greek twist." *See id.* ¶¶ 29, 69. Additionally, Georgalis does not identify the concessionaires who were allegedly allowed to sell these food items, or the food items generally sold by any such concessionaire—without such allegations, no inference of discrimination may be drawn from this instance of differential treatment. *Cf. Pullins*, 512 F. Supp. 3d at 659–60; *see also Davis v. Tex. Health & Hum. Servs. Comm'n*, 761 F. App'x 451, 455 (5th Cir. 2019).

Georgalis also alleges that he put in repeated requests to open a second booth in a different location to sell souvlaki. Doc. 15, Second Am. Compl., ¶¶ 26–27. The State Fair denied his requests and ultimately gave concessionaires who were not of Greek ancestry the right to sell souvlaki. *Id.* ¶ 68. But here again, Georgalis does not allege enough facts to infer that he was denied the opportunity to sell souvlaki because of his Greek ancestry. He does not allege anything about the proposals that were ultimately approved for other concessionaires. Without this information, the Court cannot draw the plausible inference that the only difference between Georgalis and the other concessionaires was his Greek ancestry.

Georgalis includes new allegations in his Second Amended Complaint to allege that Linnear treated him unfairly in denying his requests for new menu items. Georgalis attached a declaration to his Complaint from a former State Fair employee who reported directly to Linnear between 2018 and 2021. Doc. 15-6, Ex-F, 1. The employee stated that Linnear told her that she "had no intention to grant [Georgalis] additional food menu items or to give him a second booth." *Id.* The employee

also recalled Linnear telling her that Georgalis "gets on my nerves, I don't know why he keeps asking, I am not going to give him anything." *Id.* The employee found Linnear's refusal to be "out of the ordinary and inconsistent with the treatment she provided other fair concessionaires" and that Linnear "treated Mr. Georgalis less kindly than she did other concessionaires." *Id.* Another vendor at the State Fair noted that Linnear treated Georgalis differently from how "other concessionaires were treated when they submitted food menu changes." Doc. 15, Ex-A, 2. The vendor stated that Linnear treated Georgalis "rudely, often ignoring him when he had questions and brushing him off with a wave of her hand." *Id.* The Court does not find that these additional allegations indicate that Linnear unfairly targeted Georgalis *because* of his Greek ancestry. While they may demonstrate rude and unprofessional behavior on Linnear's part, they do not indicate that Linnear disliked Georgalis *because* he was Greek. *See Pullins*, 512 F.Supp.3d at 659 (finding a plaintiff's discriminatory intent allegations "largely subjective and insufficient" when "the picture painted by Plaintiff demonstrate[s] allegedly rude and unprofessional behavior on the part of Defendant's employees.").

Third, Georgalis's claim that other concessionaires were generally allowed to sell their booths is unavailing. There is no allegation that *any* concessionaire was allowed to sell his booth under similar circumstances. *See Zinnah*, 2023 WL 2468746, at *2 ("[Plaintiff] failed to plead facts that would suggest . . . that a non-black employee . . . received more favorable treatment than her under *similar circumstances*," (emphasis added). While Georgalis points to one example of a vendor being allowed to transfer her booth when she did not have a contract with the Fair, Georgalis has not alleged similar circumstances. *See* Doc. 15, Second Am. Compl., ¶ 13. In fact, he attaches an exhibit to his Complaint that explains why that vendor was allowed to transfer her booths. *See* Doc. 15-2, Ex-B, 1. The exhibit describes how the vendor "sold back all necessary equipment . . . to the fair,"

"did . . . her homework in selecting a strong vendor," and how the sale would leave "no change in product, employees or look/feel of the locations." *Id.* Georgalis does not allege that he submitted a proposal to sell his booth that included any of these favorable terms for the Fair.

Fourth, Georgalis claims his requests to operate a second booth were denied, while "available booths would be given to other concessionaires of non-Greek ancestry." Doc. 15, Second Am. Compl., ¶ 68. But no inference of discrimination can be drawn from the fact that Georgalis was denied a second booth. Georgalis has not alleged that *any* concessionaire was ever awarded a *second* booth during the time in which Georgalis applied; instead, he only pleads that "available booths" were given to non-Greek concessionaires. Doc. 15, Second Am. Compl., ¶ 68; *see Body by Cook*, 869 F.3d at 387 n.3. Thus, he fails to allege disparate treatment on these grounds.

Fifth, Georgalis alleges that Linnear promoted Hispanic and African American vendors over other ethnic groups. *Id.* ¶¶ 24, 34. But no inference of discrimination against the Greeks can be drawn from allegations that the Fair promoted African American and Hispanic concessionaires. Georgalis alleges that Linnear said she "strive[s] to invite more minority food and beverage vendors to participate in the Fair." *Id.*, ¶ 34. Georgalis argues that her statements "clearly indicate that she considers race when making decisions." *Id.* Georgalis also attached a Declaration from a food vendor, who was white, to his Complaint. The white food vendor stated that he asked Linnear for a second booth and Linnear "shook her head, and responded, 'No, you are not the right color, you will never get another booth.'" Doc. 15-1, Ex-A, 2. While this comment is most certainly inappropriate, it does not indicate that Linnear discriminated against those of Greek ancestry. Georgalis is alleging that he was discriminated against because he was Greek. Alleging that Linnear

discriminated against someone who was white does not help to support the claim that Linnear harbored animus towards Greeks.

Lastly, Georgalis alleged that the Fair's justification for not renewing his contract is not true. On February 28, 2023, "the Fair Advisory Committee (of which Linnear was the senior member) met to discuss the 2023 Fair." Doc. 15, Second Am., Compl., ¶ 35. The meeting minute notes from that date indicated, "[t]ime to let [Georgalis] move on from the fair. Product not executed properly as far as the tie-into the name and branding. Vendor has had multiple [] staff complaints about his negative disposition when working with other vendors and [] staff." *Id.* ¶ 35; Doc. 15-7, Ex-G, 10. Georgalis alleged that Linnear drafted these statements "knowing they were false in order to gain [the Committee's] approval . . . to expel Georgalis from the Fair." Doc. 15, Second Am., Compl., ¶ 35. Through discovery, the Fair admitted it did not possess any written complaints from patrons, other vendors, or Fair employees regarding Georgalis or his negative disposition. *Id.*; Doc. 15-8, Ex-H, 3. However, the lack of documented complaints does not indicate that the meeting notes were untrue. The Fair could have received verbal complaints. Moreover, Georgalis has not alleged whether complaints were generally documented when made verbally.

In short, Georgalis has not alleged facts which would support the inference that the State Fair ever treated him differently because of his Greek ancestry, much less that the State Fair refused to contract with him in 2023 because of his race.

For these reasons, the Court concludes that the Second Amended Complaint lacks factual allegations sufficient to support a plausible inference that Georgalis's Greek ancestry was the but-for cause of the State Fair's refusal to contract. Accordingly, the Court **DISMISSES WITH PREJUDICE** Georgalis's § 1981 claim.

B.    *Georgalis Failed to Sufficiently Plead a Fraud Claim.*

Georgalis also asserts a state-law fraud claim against the State Fair. Doc. 15, Second Am. Compl., ¶¶ 49–54. However, he failed to plead fraud with particularity as required under Federal Rule of Civil Procedure 9(b). The Court, therefore, dismisses Georgalis's claim for fraud.

Fraud claims in federal court must satisfy Federal Rule of Civil Procedure 9(b)'s heightened pleading standard. *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 550–51 (5th Cir. 2010). Under Rule 9(b), plaintiffs are required to "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). Specifically, "Rule 9(b) requires the complaint to set forth 'the who, what, when, where, and how' of the events at issue." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008) (quoting *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002)).

Here, Georgalis alleged, "[d]uring the 'Talk Back' meeting, the Fair represented to Georgalis that [he] would return to State Fair of Texas 2023." Doc. 15, Second Am. Compl., ¶ 51. In his Second Amended Complaint, Georgalis added new allegations to make out a fraud claim. These included: (1) alleging that Linnear told her assistant that Georgalis should be forwarded an application for a new booth and (2) alleging that Linnear told him about his positive improvement in sales. *Id.* "Given the timing and context," Georgalis argues, "the only reasonable interpretation was that a second booth was being given to Georgalis . . . [or] that the Fair would provide a [single] booth to [him] in 2023." *Id.* The Court disagrees.

Georgalis does not explain how these statements are fraudulent. Georgalis "only alleges that certain statements . . . were made by [the State Fair], that turned out to be untrue, or were never carried out," but this does not mean there was any fraud. *See Taha v. William Marsh Rice Univ.*, No.

H-11-2060, 2012 WL 1576099, at *3 (S.D. Tex. May 3, 2012). Even to say that these statements turned out to be untrue is far-fetched. The additional information provided in his Second Amended Complaint merely suggests that the State Fair intended to provide him with an application to apply for a booth. There is nothing to suggest that the State Fair made an untrue, let alone fraudulent, promise that it would guarantee Georgalis a booth. Accordingly, the Court **DISMISSES WITH PREJUDICE** Georgalis's claim for fraud.

C.    *Georgalis Did Not Plead Sufficient Facts to Establish a Promissory Estoppel Claim.*

Lastly, Georgalis asserts a state law claim for promissory estoppel. Doc. 15, Second Am. Compl., ¶¶ 55–62. The Second Amended Complaint lacks sufficient factual content to support a finding that the State Fair made an actionable promise to Georgalis. The Court, therefore, dismisses Georgalis's promissory estoppel claim.

"Although promissory estoppel is normally a defensive theory, it may nonetheless be asserted by a plaintiff as an affirmative ground for relief." *Medistar Corp. v. Schmidt*, 267 S.W.3d 150, 163 (Tex. App.—San Antonio 2008, pet. denied). An equitable doctrine, promissory estoppel operates to "prevent[] a party from insisting upon his strict legal rights when it would be unjust to allow him to enforce them." *Allied Vista, Inc. v. Holt*, 987 S.W.2d 138, 141 (Tex. App.—Houston [14th Dist.] 1999, pet. denied). Under Texas law, a plaintiff must initially plead, and ultimately prove, three elements to prevail on a claim for promissory estoppel: "(1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to [his] detriment." *Vlasek v. Wal-Mart Stores, Inc.*, No. H-07-0386, 2008 WL 167082, at *3 (S.D. Tex. Jan. 16, 2008).

Georgalis's promissory estoppel claim is premised on two alleged promises made by the State Fair. *See* Doc. 15, Second Am. Compl., ¶ 56. First, the State Fair allegedly promised that he would

return as a concessionaire for the 2023 Fair. *Id.* Second, the State Fair allegedly promised that he would be given a second booth for the 2023 Fair. *Id.* To support the first promise, Georgalis alleges that a Fair employee sent him an email stating, "Returning vendor applications are DUE- February 28th. If you do not submit an application we will assume you are not returning." *Id.* ¶ 31. Georgalis asserts that this constitutes a guarantee to a booth. *Id.* ¶ 32. To support the second promise, Georgalis alleges that Linnear and Nolen stated that Georgalis experienced positive sales growth and would be provided with an additional application for a new booth at the Fair. *Id.* ¶ 58. In effect, Georgalis is claiming that, by requesting he fill out two applications, the State Fair promised Georgalis that he would return to the 2023 Fair and that he would receive a second booth. *Id.* ¶¶ 31, 56, 58.

Georgalis's allegations do not support a claim for promissory estoppel because he pleads no facts about the State Fair's application process to permit the plausible inference that the State Fair's request for Georgalis to fill out an application was a sufficiently definite promise. "As the descriptive title of the cause of action itself connotes[,] the existence of a promise is a *sine qua non* of a promissory estoppel claim." *Temple v. Am. Airlines, Inc.*, No. 3-99-CV-2289-AH, 2001 WL 1012683, at *3 (N.D. Tex. Aug. 17, 2001) (Sanderson, M.J.). "[T]he asserted 'promise' must be sufficiently specific and definite that it would be reasonable and justified for the promisee to rely upon it as a commitment to future action." *Comiskey v. FH Partners, LLC*, 373 S.W.3d 620, 635 (Tex. App.—Houston [14th Dist.] 2012, pet. denied). Promises conditioned on future events generally are not sufficiently definite to support a claim for promissory estoppel. *See e.g.*, *Davis v. Texas Farm Bureau Ins.*, 470 S.W.3d 97, 108 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (an offer of settlement did not constitute an "actual promise" because it was contingent on offeree's future acceptance); *Addicks*

*Servs., Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 301 (5th Cir. 2010) ("[S]tatements of an intention to reach agreement have been found too vague and indefinite to survive summary judgment on promissory estoppel."). Here, the State Fair's requests that Georgalis fill out an application, at most, invited Georgalis to make an offer, which the State Fair could then accept or reject. *Cf. Republic Nat. Life Ins. Co. v. Hall*, 232 S.W.2d 697, 700 (Tex. 1950); *Brownwood Benev. Ass'n v. Maness*, 30 S.W.2d 1114, 1115 (Tex. App.—Eastland 1930, writ. ref'd); *Urb. Elec. Servs., Inc. v. Brownwood Indep. Sch. Dist.*, 852 S.W.2d 676, 678 (Tex. App.—Eastland 1993, no writ). Any promise made by the State Fair was conditioned on Georgalis's completion of the applications and the State Fair's subsequent approval of those applications. *See Davis*, 470 S.W.3d at 108.[2] Without more, the State Fair's invitation to apply reflects only "the indefinite assurance of an ongoing negotiation process, rather than a commitment to perform specific acts, and do[es] not evidence a definite promise." *Addicks Servs.*, 596 F.3d at 301. Accordingly, the Court **DISMISSES WITH PREJUDICE** Georgalis's claim for promissory estoppel.

D.      *The Court Dismisses All Claims with Prejudice.*

Lastly, the Court addresses the State Fair's request to dismiss Georgalis's claims with prejudice. *See* Doc. 16-1, Proposed Order, 1. A plaintiff's failure to plead a claim should not automatically result in dismissal with prejudice. *Hart v. Bayer Corp.*, 199 F.3d 239, 247 n. 6 (5th Cir. 2000). However, a court may dismiss a claim with prejudice if the pleading defect is incurable or if the plaintiff has had other opportunities to amend his complaint. *Id.*

---

[2] The Court also notes that the State Fair only provided Georgalis with an application for a second booth upon Georgalis's request. *See* Doc. 15, Second Am. Compl., ¶ 51. The Court is hesitant to place any significance on the State Fair's supplying an application under these circumstances. Moreover, Georgalis should have been aware that merely being provided an application for a second booth did not guarantee he would be given a second booth considering he submitted numerous applications for an additional booth in the past, which were uniformly denied. *Id.* ¶ 40.

Georgalis has already amended his complaint twice. *See generally* Doc. 4, Am. Compl.; Doc. 15, Second Am. Comp. The Court previously dismissed Georgalis's claims, identifying the deficiencies in his Complaint and allowing him the opportunity to refile. Here, Georgalis's Second Amended Complaint has done nothing to cure his failure to state a claim upon which relief can be granted. *See Washington v. Weaver*, No. 08-30392, 2008 WL 4948612, at *3 (5th Cir. Nov. 20, 2008) (citing *Bazrowx v. Scott*, 136 F.3d 1053, 1054 (5th Cir.1998)) (holding that dismissal without leave to amend is appropriate when the plaintiff has presented his best case). Given that Georgalis could not cure the pleading deficiencies the Court identified in its first Order granting the State Fair's Motion to Dismiss, the Court dismisses Georgalis's Second Amendment Complaint with prejudice.

## IV.

## CONCLUSION

For these reasons, the Court **GRANTS** the State Fair's Motion to Dismiss (Doc. 16). The Court **DISMISSES** the Second Amended Complaint **WITH PREJUDICE**. A final judgment will follow.

SO ORDERED.

SIGNED: October 31, 2024.

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE